IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

STRATEGIC DIGITAL SIGNAGE, LLC,

                Plaintiff,

v.

ASHLEY HOME STORES, LTD.,

                Defendant.

OPINION AND ORDER

18-cv-199-wmc

---

Plaintiff Strategic Digital Signage, LLC, ("SDS") sued defendant Ashley Home Stores, Ltd. ("Ashley") for breach of contract, alleging that Ashley breached the terms of their "In-Store Technology Authorization Agreement" (the "Authorization Agreement") by failing to provide content in exchange for SDS's development of technology for Ashley retailers. Presently before the court are: (1) Ashley's motion for summary judgment (dkt. #33); (2) SDS's motion to dismiss Ashley's counterclaim (dkt. #57);[1] and (3) Ashley's motion to strike Paul Miller's declaration (dkt. #62). For the reasons that follow, the court will deny defendant's motion to strike, grant defendant's motion for summary judgment, and grant in part and deny in part plaintiff's motion for summary judgment.

---

[1] While plaintiff initially framed this motion as one to dismiss for failure to state a claim, it suggested converting the motion into one for summary judgment and submitted supporting proposed findings of fact, to which defendant responded and proposed additional facts. Considering how close this matter is to trial, the court will accept the parties' invitation and treat this motion as one for summary judgment. Fed. R. Civ. P. 12(d) ("If, on a motion under 12(b)(6) . . ., matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

## UNDISPUTED FACTS[2]

According to the Illinois Secretary of States, SDS was formed in 2014. On July 18, 2015, SDS and Ashley entered the Authorization Agreement. Kevin Hook, Ashley's executive vice president of brand development, eventually became the lead business negotiator for Ashley, while final approval of the Authorization Agreement remained with Ashley's CEO, Mark Dufresne. Ashley did not have a standard protocol for vetting potential vendors, and VP Hook did not inquire, nor was he aware of anyone else inquiring about, whether Miller had a criminal background. (*See* Hook Dep. (dkt. #56) 14:8-15:13, 17:21-24.) Hook was also unaware of anyone asking for financial information about either Miller or SDS, although he remembered being told about a conversation addressing finances. (*Id.* at 15:14-16:10, 17:5-20, 17:25-18:20.)

---

[2] For purposes of summary judgment, the following facts are material and undisputed except where noted below. At the outset, both sides' proposed factual submissions and responses on defendant's motion for summary judgment were unnecessarily long. Defendant's proposed facts at times were repetitive. (*See, e.g.*, Def.'s PFOF (dkt. #40) ¶¶ 21, 26-28, 30, 48-49 (explaining that -- and at times quoting -- § 4 of the Agreement outlined additional development work); *id.* ¶¶ 55-56 (both reading "The API that Ashley created 'contain[ed] product information for all products sold on the www.ashleyfurniture.com website, which would cover all products sold by '"brick and mortar"' Ashley HomeStore branded retailers and about 85 percent of the products sold by non-HomeStore retailers.").) On the other hand, plaintiff relied on boilerplate responses purporting to contend that "[t]he ultimate fact or conclusion that Ashley is drawing is disputed" despite failing to dispute the *substance* of the fact actually proposed (*see, e.g.*, Pl.'s Resp. to Def.'s PFOF (dkt. #48) ¶¶ 13-17, 21-22, 27-28, 30-35) and included facts that were neither directly responsive nor necessary to create a dispute of fact (*see, e.g., id.* ¶¶ 55, 57, 63, 65, 70). *See* Prelim. Pretrial Packet (available at dkt. #15) 5 ("When a responding party disputes a proposed finding of fact, the response must be limited to those facts necessary to raise a dispute. The court will disregard any new facts that are not directly responsive to the proposed fact. If a responding party believes that more facts are necessary to tell its story, it should include them in its own proposed facts."). Similarly, defendant's frequent objections to plaintiff's additional, proposed findings of fact, including "two factual propositions in a single paragraph" (*see, e.g.*, Def.'s Resp. to Pl.'s Add'l PFOF (dkt. #61) ¶¶ 1-4), is technically correct, but largely unnecessary or at least redundant. While counsel may see each of these things as "zealous advocacy," they are largely a waste of time and money for the parties and the court.

Ashley created an XML data feed between September and December 2016, which was accessible through an application program interface (an "API").[3] This "contain[ed] product information for all products sold on the www.ashleyfurniture.com website, which would cover all products sold by 'brick and mortar' Ashley HomeStore branded retailers and about 85 percent of the products sold by non-HomeStore retailers." (Daniels Decl. (dkt. #34) ¶ 2.) This data feed is the most complete data feed that Ashley provides to vendors and wholesale customers; it contains 80-100 data fields for each product SKU. Ashley gave SDS access to the XML data feed in December 2016.

Before Ashley's creation of the XML data feed, wholesale customers and vendors such as SDS received product information through CSV data feeds, with or without updates from Ashley's electronic data interchange (an "EDI").[4] In fact, Ashley still uses its CSV data feeds with vendors or wholesale customers who lack the capability to use the API.

SDS contends that it entered the Authorization Agreement expecting to turn a profit based on the projection that 260 stores would sign up for at least three years. (*See* Outline of Agreement (dkt. #41-4) 10 (anticipating a rollout of 260 stores "based on Licensee buy in and interest in the program as well as success of the program within the

---

[3] Data feeds come in a variety of forms, such as comma-separated values ("CSV") and extensible markup language ("XML"). The parties agree that the CSV data feed was inferior to the XML data feed.

[4] Plaintiff purportedly "[d]enied" this proposed fact but then practically admitted it, stating "[b]efore Ashley created an XML data feed, SDS received Ashley product information through CSV data feeds," albeit while also complaining about the completeness of the information provided and its lack of access to Ashley's EDI.

3

original 25 locations," but adding that "Ashley cannot guarantee Licensee participation."); SDS 30(b)(6) Dep. (dkt. #28) 169:4-12, 182:8-19 (Paul Miller testifying that he thought three years "was a fair number" and "everyone loved what we were doing. They loved what was in their stores. They liked what they saw.").)

Even so, SDS had never developed or sold a product like the In-Store Technology offered to the Licensees. Likewise, John Miller acknowledged that the service contemplated by the Agreement was fundamentally different from work SDS had previously performed. Before entering into the Authorization Agreement, the only sale SDS had made was to a café run by John Miller's friend, and that consisted of TV monitors that could display digital messages and ads.

John Miller characterized Ashley as SDS's "$5 billion company as a partner," and he considered the arrangement to be "monumental" for SDS. (John Miller Dep. (dkt. #29) 57:3-7, 86:9-18.) SDS devoted its resources to Ashley, declining to offer its technology to Ashley's competitors. (*Id.* at 86:19-87:7.) Following execution of the Authorization Agreement, however, SDS did not have sufficient revenue to cover its overhead and costs, making it unable to pay its debts. SDS contends that its financial problems were caused by Ashley. (Pl.'s Add'l PFOF (dkt. #49) ¶ 14.)[5]

OPINION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[5] Additional facts, including the material provisions of the parties' Authorization Agreement are addressed below.

Fed. R. Civ. P. 56(a). For the party with the burden of proof in particular, "[s]ummary judgment is the 'put up or shut up' moment in a lawsuit." *Sigel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)). Accordingly, it is not enough for the nonmoving party to "simply show that there is some metaphysical doubt as to the material facts," as a mere "scintilla of evidence in support of the nonmoving party's position will be insufficient to survive a summary judgment motion." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Instead, "there must be evidence on which the jury could reasonably find in favor of the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 252). Applying that standard here, defendant's motion for summary judgment and a substantial part of plaintiff's motion will be granted.

## I. Defendant's Motion for Summary Judgment (dkt. #33)

In its motion for summary judgment, defendant raises a number of circuitous arguments that challenge plaintiff's ability to establish a breach of contract claim under Wisconsin law. Because the undisputed facts are such that a reasonable jury could not find for plaintiff on this claim, the court will grant summary judgment to defendant. As the court previously explained, a claim for breach of contract under Wisconsin law requires proof of three elements: (1) formation of a valid contract; (2) breach; and (3) damages caused by that breach. (MTD Op. & Order (dkt. #31) 3 (citing *Matthews v. Wis. Energy Corp.*, 534 F.3d 547, 553 (7th Cir. 2008)).) While the Authorization Agreement certainly comprised of a valid contract between the parties, plaintiff cannot establish the other elements of its claim for the reasons addressed below.

## A. Breach

To begin, contract construction aims "to ascertain the true intentions of the parties as expressed by the contractual language" with the purpose of "determin[ing] what the parties contracted to do as evidenced by the language they saw fit to use." *State ex rel. Journal/Sentinel, Inc. v. Pleva*, 155 Wis. 2d 704, 711, 456 N.W.2d 359, 362 (1990). "Stated another way, the best indication of the parties' intent is the language of the contract itself, for that is the language the parties 'saw fit to use.'" *Town Bank v. City Real Estate Develop., LLC*, 2010 WI 134, ¶ 33, 330 Wis.2d 320, 793 N.W.2d 476 (internal citations omitted).

The Authorization Agreement here opens with an explanation that "SDS has developed for Licensor an in-store technology system that manages the display of video content on Internet-connected in-store video monitors and that may, after continued development, also include additional functionality . . . such as a virtual catalog . . . ." (Authorization Agreement (dkt. #1-1) 1.) Plaintiff acknowledges that "a virtual catalog, a virtual room design tool, and shopping and ordering tools had not been developed" as of the Authorization Agreement's effective date. (SDS 30(b)(6) Dep. (dkt. #28) 278:9-13.)

The Authorization Agreement also grants plaintiff permission to offer interested Licensees the "In-Store Technology," if the Licensees: "(i) enter[ed] into a separate written agreement in substantially the form attached . . . with SDS and (ii) enter[ed] into an agreement with [Ashley] pursuant to which the Licensee is granted a limited license to publish . . . content supplied by [Ashley]."[6] (Authorization Agreement (dkt. #1-1) 1.) The

---

[6] As referenced, the Authorization Agreement included a form "SDS Agreement" between SDS and an interested Licensee. (*Id.* at 7-20.)

in-store technology system SDS wanted to sell to Ashley's Licensees included hardware, installation and content management. Even so, SDS could only provide In-Store Technology to Licensees who signed *both* an agreement with SDS and a Content License with Ashley. At the motion to dismiss stage, the court referred to plaintiff's allegation in its complaint that Licensees had "terminated their In-Store Technology Agreements." (Compl. (dkt. #1) ¶ 11.) However, at summary judgment, SDS produced only two SDS Agreements with Ashley Licensees. (SDS Discovery Resp. (dkt. #41-1).) Moreover, SDS has produced *no* content licenses. SDS also failed to identify any other Licensees that may have executed a Content License or SDS Agreement. Finally, the terms of the two SDS Agreements actually signed were limited to the shorter of either 12 months following "the first live productive use of the In-Store Technology" or 13 months after the Effective Date. (SDS Agreements (dkt. #41-1) 13, 26.)

There is no breach of contract here to the extent that plaintiff is alleging a breach based on its own unmet expectation that all 260 Licensees would pay a $6,000 one-time development fee, and commit for at least three years to pay annual content and management fees of $4,260 and purchase hardware for $3,500. (Pl.'s Interrog. Resp. No. 17 (dkt. #41-2) 10-11; *see also* Outline of Agreement (dkt. #41-4) 4.) The Authorization Agreement does not guarantee a rollout of the In-Store Technology, much less that 260 retail stores will sign SDS Agreements or rely on SDS technology for at least three years. On the contrary, the Authorization Agreement *limits* use of the In-Store Technology to "interested Licensees" and the sample SDS Agreement contemplates a term of up to 13 months. (Authorization Agreement (dkt. #1-1) 1, 8.)

7

The Authorization Agreement is also limited to its written terms, as it provides that it "constitutes the sole and entire agreement of the parties . . . with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written an oral, with respect to such subject matter." (*Id.* at 4.) *See Town Bank*, 2010 WI 134, ¶ 37 ("A contract that represents the final and complete expression of the parties' agreement is considered fully 'integrated.' If the contract is integrated, absent the evidence of fraud, duress, or mutual mistake, the court construing the contract may not consider evidence of any prior or contemporaneous oral or written agreement between the parties."); *id.* ¶ 39 ("[A]n unambiguous merger or integration clause demonstrates that the parties intended the contract to be a final and complete expression of their agreement."). Accordingly, the lack of signed-up Licensees cannot by itself be the basis for a breach of contract claim.

Next, the Authorization Agreement required SDS to "perform additional development work with respect to the In-Store Technology and create additional content . . . in accordance with statements of work acceptable to [Ashley]." (Authorization Agreement (dkt. #1-1) 2.) In particular, Section 4 of the Authorization Agreement outlines future development, including the virtual catalog. (*Id.*; *see also* 30(b)(6) Dep. (dkt. #28) 278:9-13.) This provision of the Authorization Agreement required "Deliverables," which were to "conform to the specifications set forth in the Statement of Work," as well as "be subject to [Ashley's] review, testing and acceptance." (Authorization Agreement (dkt. #1-1) 2.) Regardless of whether SDS provided a Statement of Work -- in the appropriate form or not -- Ashley never approved a Statement of Work for additional

8

development work.

Finally, in its complaint, plaintiff alleged that defendant breached the Authorization Agreement by "fail[ing] and refus[ing] to provide the Content to SDS." (Compl. (dkt. #1) ¶ 11.) Plaintiff cannot establish a breach of the Authorization Agreement here either. As the court previously noted, while the Authorization Agreement lacked an "express obligation to deliver a specific quantity or quality of Content within a specific timeframe[,] . . . it would seem unreasonable to construe the Agreement as imposing *no* obligation on Ashley to work with SDS to populate its 'In-Store Technology' with some meaningful content." (MTD Op. & Order (dkt. #31) 4.) However, Ashley provided data, which SDS incorporated into a catalog it presented to Ashley. (Pl.'s Resp. to Def.'s PFOF (dkt. #48) ¶ 72.) SDS never informed Ashley that using the XML would undermine SDS's ability to create an interactive product catalog. Plaintiff's complaint that the data was incomplete or belated is not enough to give rise to a breach of the terms of the Authorization Agreement.

Likewise, plaintiff cannot show that Ashley breached its broader duty of good faith and fair dealing. Ashley provided data to SDS, first through a CSV feed and then through both that CSV feed *and* an XML feed. While SDS complains about the quality of this data, SDS fails to come forward with any evidence that Ashley had better data available that was being withheld from SDS.[7] The undisputed facts establish that Ashley, at great expense, developed the XML data feed and then provided it to SDS. Thus, it is undisputed

---

[7] SDS contends that it was promised an API data feed, but that promise does not appear in the Authorization Agreement.

that Ashley provided SDS with and updated the data it had.[8]  Other than SDS's complaint about delay, it cannot point to any failure.  There is no evidence suggesting that the delays were caused by a lack of good faith on Ashley's part.  As such, this too does not support a breach of contract claim.

Accordingly, no reasonable jury could conclude that Ashley breached the Authorization Agreement.  This alone is fatal to plaintiff's claim.

**B. Damages**

"Under Wisconsin law, damages for breach of contract include those damages arising from the breach and must 'reasonably . . . be supposed to have been within the contemplation of both parties at the time they made the contract as the probable result of the breach of it.'" *Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353, 1362 (7th Cir. 1996) (quoting *Reiman Assocs., Inc. v. R/A Advert., Inc.*, 102 Wis.2d 305, 320, 306 N.W.2d 292, 300 (Wis. App. 1981)).  Additionally, "[a]ny damages awarded must be certain, both in their nature and in respect to the cause from which they proceed"; likewise, a party "cannot be placed in a better position because of the breach than [it] would have been had the contract been performed."  *T & HW Enters. v. Kenosha Assocs.*, 206 Wis.2d 591, 604, 557 N.W.2d 480 (Wis. Ct. App. 1996) (citing *Sporleder v. Gonis*, 68 Wis.2d 554, 559-60, 229 N.W.2d 602 (1975)) (concluding plaintiff's evidence of lost profits "was too speculative to support the jury's award" because the intended business

---

[8] SDS's complaint that it never had access to the EDI is insufficient since it failed to produce any evidence from which a reasonable jury could have found such access would have made a difference, particularly since Miller maintains the data was ultimately insufficient whether in CSV or XML format.

10

"was a new and untried business venture," with an "unproven" concept, making "any projections as to profit . . . purely conjectural").

Typically, "[t]o establish lost profits, the claimant must produce evidence of the business's revenue as well as its expenses. Assertions as to the amount of lost profits have no evidentiary value unless supported by figures showing profits and losses." *Mrozek v. Intra Fin. Corp.*, 2005 WI 73, ¶ 38, 281 Wis.2d 448, 669 N.W.2d 54 (quoting *Lindevig v. Dairy Equip. Co.*, 150 Wis.2d 731, 740, 442 N.W.2d 504 (Ct. App. 1989)) (finding "information presented [wa]s not sufficient for a fact finder to reasonably ascertain lost profits" where plaintiffs offered a franchise license agreement, projected operations and pre-tax cash flow, a property appraisal, and five years of tax returns from the entity that purchased the property and operated the business).[9] Put another way, "failure to provide evidence of expenses relating to a business owner in its position results in [plaintiff] failing to meet its burden." *Id.* ¶ 42. For a new business without a track record of profits, the claimant must "present credible comparable evidence or business history and business experience sufficient to allow a fact finder to reasonably ascertain future lost profits." *Id.* (quoting *T & HW Enterprises*, 206 Wis.2d at 605 n.6).

Even assuming Ashley breached the Authorization Agreement, therefore, plaintiff cannot establish lost profits on the record here. The best evidence of this is plaintiff's own outrageous lost profit projections. Plaintiff has estimated its damages to be nearly $6

---

[9] The *Mrozek* court also explained that even if the plaintiff had produced deposition testimony to establish the development of the area around the motel, "it would not allow [the court] to reasonably ascertain the profitability of a particular establishment within that area." 2005 WI 73, ¶ 41.

million based on "Ashley's stated expectation that 260 Licensees would commit" for at least three years, with the attendant $6,000 one-time development fees, annual content and management fees of $4,260, and hardware sales of $3,500, per store. (Pl.'s Interrog. Resp. No. 17 (dkt. #41-2) 10-11; *see also* Outline of Agreement (dkt. #41-4) 4.) As noted previously, however, the Authorization Agreement does not outline projected rollout of the In-Store Technology, nor does it say anything about 260 stores signing up or relying on the technology for at least three years.

While plaintiff claims to have relied on Ashley's projections regarding rollout, it acknowledges there was no certainty that all projected 260 stores would have acquired the system. (SDS 30(b)(6) Dep. (dkt. #28) 157:7-159:2.) Likewise, plaintiff used a three-year term because Miller "thought that was a fair number," and his perception that "everyone loved what we were doing. They loved what was in their stores. They liked what they saw." (SDS 30(b)(6) Dep. (dkt. #28) 169:4-12, 182:8-19.) Again, as noted previously, the model SDS Agreement provided for a term of no more than 13 months.

Accordingly, plaintiff's claim rests solely on unsubstantiated projections and Miller's say-so. *See Ariens Co. v. Woods Equipment Co.*, No. 05-C-139, 2006 WL 2597979, at *6 (E.D. Wis. Sept. 9, 2006) (excluding testimony of a corporate executive concerning "lost profits -- as a lay witness -- when those profits are based not on existing data but on projections of future sales"); *id.* at *7 ("[Defendant's corporate manager] wishes to testify not about facts within his personal knowledge, but about *counter* factual projections that [defendant's] sales *would have been* higher *if* they had been able to sell the mowers they allege [plaintiff] should have supplied them."). Here, plaintiff has named no damages

12

expert, leaving the jury with pure speculation by Miller as to how many, if any, licensees would have signed up and under what terms. Further, plaintiff provides no evidence of a comparable business's history or experience, surveys, or current sales on which an expert might even begin to formulate an opinion as to future lost profits. On this record, plaintiff's claim to lost profits fails, and since this was ultimately its only basis for claiming damages, plaintiff's breach of contract claim again fails.[10]

## II. Plaintiff's Motion for Summary Judgment (dkt. #57)

Also before the court is plaintiff's motion for summary judgment on defendant's counterclaim for intentional misrepresentation and fraudulent inducement. (Pl.'s Mot. (dkt. #57) 1.) Ashley alleges that during the course of negotiations over the Authorization Agreement, Miller misrepresented himself as the "President and Head of Sales" at SDS, even though he was an independent contractor, failed to disclose his financial and criminal background, and failed to disclose SDS's financial position. (Counterclaim (dkt. #46) ¶¶ 23-27; *see also id.* ¶¶ 29-30.)

To establish a claim for fraudulent or intentional misrepresentation, a plaintiff must establish five elements:

---

[10] While this would not preclude a claim for out of pocket expenses if plaintiff had established a breach, plaintiff does not appear to have provided any proof of these expenditures and neither side addresses any such claim in their briefing. In fairness, the complaint requests "judgment against Ashley for the loss of its investment in the development of the In-Store Technology" (Compl. (dkt. #1) 4), and attaches as Exhibit B what appears at least in part to be itemized list of expenses. When pressed in discovery as to the basis for those itemized costs, however, plaintiff abandoned them in favor of a larger, lost profit calculation based on the expectation of 260 Licensees subscribing for three years (Pl.'s Interrog. Resp. No. 17 (dkt. #41-2) 10-11). Accordingly, plaintiff appears to have waived any claim to reimbursement of out-of-pocket expenditure, even if Ashley had breached the Authorization Agreement.

> (1) the defendant made a factual representation; (2) which was untrue; (3) the defendant either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) the defendant made the representation with intent to defraud and to induce another to act upon it; and (5) the plaintiff believed the statement to be true and relied on it to [its] detriment.

*Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 12, 283 Wis.2d 555, 699 N.W. 205 (quoting *Ramsden v. Farm Credit Servs. of N. Cent. Wis. ACA*, 223 Wis.2d 704, 718-19, 590 N.W.2d 1 (Ct. App. 1998)).[11]

While such a claim may arise from either an affirmative statement or an omission, a duty to disclose must exist before an entity in a business deal can be liable for failing to disclose a material fact. *Id.* ¶ 13 (citations omitted).[12] Generally, there is no duty to disclose in an arm's length transaction. *Id.* ¶ 15 (citing *Ollerman v. O'Roarke Co.*, 94 Wis. 2d 17, 29, 288 N.W.2d 95 (1980)). However, Wisconsin courts have recognized exceptions, including: (1) "where the seller has told a half-truth or has made an ambiguous statement if the seller's intent is to create a false impression and [the seller] does so"; or (2) "where the facts are peculiarly and exclusively within the knowledge of one party to the transaction and the other party is not in a position to discover the facts." *Id.* ¶ 15 n.4 (citing *Ollerman*, 94 Wis.2d at 31). In *Kaloti Enterprises*, the Wisconsin Supreme Court concluded that parties to a business transaction *are* under a duty to disclose a fact when:

> (1) the fact is material to the transaction; (2) the party with

---

[11] "Liability for fraud in the inducement requires that the five elements of an intentional misrepresentation claim for relief, as discussed above, are satisfied, and in addition, that the misrepresentation has occurred before contract formation." *Kaloti Enters.*, 2005 WI 111, ¶ 30 (citing *Digicorp, Inc. v. Ameritech Corp.*, 2003 WI 54, ¶ 52, 262 Wis.2d 32, 662 N.W.2d 652).

[12] Where a duty to disclose is present, the failure to do so is treated as representing that the fact does not exist. *Id.* ¶ 13 (citation omitted).

> knowledge of that fact knows that the other party is about to enter into the transaction under a mistake as to the fact; (3) the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it; and (4) on account of the objective circumstances, the mistaken party would reasonably expect disclosure.

*Id.* ¶ 20.

In its brief, Ashley starts by asserting that "SDS wholly fails to address that portion of Ashley's fraud claim centered on SDS's affirmative misrepresentations," but then failed to detail what they were beyond stating "Ashley alleges that Miller affirmatively misrepresented his true relationship and position with SDS -- holding himself out as President and Head of Sales, when he in fact was merely a contractor" (Def.'s Opp'n (dkt. #71) 1, 8), which goes no further than the allegations set forth in the counterclaim (Counterclaim (dkt. #46) ¶¶ 23, 25, 29-30). Accordingly, the only affirmative misrepresentation concerned Miller's relationship to SDS. Whether Miller was President and Head of Sales for SDS or simply an independent contractor acting on its behalf, he was the principal negotiating the terms of the Authorization Agreement for SDS. Since Ashley took no steps to otherwise vet Miller or anyone else at SDS before entering into the Authorization Agreement, a jury would be hard pressed to find Miller's misrepresentations of his official role inside the company to be a fraudulent inducement to sign on.[13]

---

[13] Whether as a matter of law a reasonable jury could find fraudulent misrepresentation based on this single, alleged affirmative misrepresentation is obviously a closer question. If Ashley wants to press forward with this narrow claim, despite SDS's apparent insolvency, it should promptly notify the court. Otherwise, the court sees little purpose in withholding judgment and closing this case.

As to the alleged omissions, SDS contends that it was not under a duty to disclose because Ashley cannot establish that they were material or solely within SDS's knowledge. (Pl.'s Reply (dkt. #78) 3-5.)  SDS also contends that there was no "special relationship" requiring disclosure, because the two entities had never done business together before the Authorization Agreement.  (*Id.* at 5-6.)  In response, Ashley argues that:  (1) because SDS saw Ashley as a "partner," the entities had a relationship "of trust and confidence" necessitating disclosure; (2) SDS provides no evidence that Ashley failed to inquire, only that Kevin Hook did not inquire; (3) materiality must be examined subjectively *and* objectively; and (4) SDS's finances and Miller's background were both objectively and subjectively material because Hook would not have recommended that Ashley pursue the contract with SDS had he known of Miller's conviction or SDS's precarious financial situation.  (Def.'s Opp'n (dkt. #71) 9-12.)

The court agrees with SDS.  First, there was no "special relationship" between SDS and Ashley, at least at the time of negotiating the Authorization Agreement.  Rather, they were parties negotiating at arms' length over a contract with no pre-existing relationship. Ironically, Ashley would rely on *SDS's* perspective -- that Ashley was a partner and the lifeblood of SDS's business -- ignoring that SDS, through Miller, is the entity accused of omitting and misrepresenting information.  In contrast, Ashley was *not* dependent on SDS in any way during negotiations, seemingly having all the leverage, including taking its business to a different contractor.  If there was a special relationship between the parties, it was one-sided, and Ashley as the one in a stronger bargaining position cannot use SDS's arguable vulnerability and expectation of a joint enterprise going forward as a sword against

16

it to create a disclosure duty not typically present in an arms-length negotiation.

Second, a reasonable jury could not find that the alleged omissions were material to Ashley. Ashley points to no evidence establishing that it inquired about the background or finances of either SDS or Miller. The closest Ashley comes is Kevin Hook's deposition testimony that he remembered a conversation, but did not remember if there was a formal request about financial information.[14] (Hook Dep. (dkt. #56) 15:14-25.) On the other hand, Miller declared that Ashley did not so inquire. (Miller Decl. (dkt. #55) ¶ 15.) As plaintiff contends, Ashley's obvious failure to make any meaningful inquiries into SDS's or Miller's background or financial wherewithal is the best indicator of the lack of materiality to Ashley. (Pl.'s Reply (dkt. #78) 4.) Regardless, no reasonable jury could find that SDS knew this information was important to Ashley.

Indeed, given the one-sided nature of the parties' ultimate agreement as discussed above -- with the burden largely on SDS to make the new program attractive to Ashley's downstream retailers -- it is perhaps understandable that Ashley did not do much due diligence. Certainly, there is no objective support for a reasonable trier of fact to conclude that Ashley relied upon, much less expected disclosure, of SDS's or Miller's background or finances. Ashley's contention that it likely would not have entered into the Authorization Agreement had it known about Miller's background or SDS's finances is likely nothing more than self-serving hindsight. Additionally, because Miller was actually an independent contractor -- and not the President and Head of Sales -- his financial background and

---

[14] However, the admissibility of this testimony is questionable at best. Hook's knowledge of the conversation appears to have come from Mark Dufresne who participated in the conversation. (Hook Dep. (dkt. #56) 16:1-10.) Neither side appears to have deposed Dufresne.

17

convictions are even less material. Like other contracting parties, Ashley is responsible for doing its own due diligence and must live with the results of not adequately vetting a potential contracting partner.

Third and finally, at least some of the relevant information was not "peculiarly and exclusively within the knowledge of [SDS]." Specifically, Ashley had the ability to run a background check on Paul Miller, which would have revealed his convictions and bankruptcies. Likewise, Ashley knew that SDS's resources were not unlimited. (*See* Mattea Dep. (dkt. #66) 29:4-20 (testifying that prior to negotiations on the Authorization Agreement, he advised Paul Miller not to "spend any money until [SDS] ha[d] a contract with Ashley so that [SDS] d[id]n't get caught short" because SDS "was not a big operator").) Accordingly, Ashley must live with its failure to investigate its contractor and plaintiff's motion for summary judgment will be granted in substantial part.[15]

ORDER

IT IS ORDERED that:

1) Defendant's motion for summary judgment (dkt. #33) is GRANTED.

2) Defendant's motion to strike the Miller Declaration (dkt. #62) is DENIED.

3) Plaintiff's motion to dismiss the counterclaim (dkt. #57) is GRANTED IN PART and DENIED IN PART, as set forth above.

---

[15] Defendant may have an argument that under *Van Lare v. Vogt, Inc.*, 2004 WI 110, ¶ 30, 274 Wis.2d 631, 683 N.W.2d 46, Miller's conviction for misappropriation of funds was of a nature that it should have been disclosed during negotiations, but the court again sees little point in holding trial on this issue since the vast majority of the other claims are gone. As with its claim based on Miller's alleged affirmative misrepresentation, if Ashley wants to press forward on this narrow claim, it should promptly notify the court.

4) Defendant may have seven days to advise whether it wishes to proceed on what remains of its counterclaim for Miller's misrepresentation of his positions within SDS or failure to disclose his prior conviction. Otherwise judgment will be granted on that claim as well.

Entered this 5th day of June, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge